**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

ROB COLBERT                          CASE NO. 18-13211

     *Plaintiff*,                   DISTRICT JUDGE PAUL D. BORMAN
*v*.                                          MAGISTRATE JUDGE PATRICIA T. MORRIS

COMMISSIONER OF SOCIAL SECURITY,

     *Defendant*.
_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (R. 10, 15)

## I.    RECOMMENDATION

Plaintiff Rob Colbert challenges Defendant Commissioner of Social Security's final decision denying his claims for Title II Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI). The case was referred to the undersigned for review. (R. 2); *see* 28 U.S.C. § 636(b)(1)(B); E.D. Mich. LR 72.1(b)(3). For the reasons below, I conclude that substantial evidence supports the Commissioner's decision. Accordingly, I recommend **DENYING** Plaintiff's Motion for Summary Judgment, (R. 10), **GRANTING** the Commissioner's Motion, (R. 15), and **AFFIRMING** the Commissioner's final decision.

## II.    REPORT

### A.    Introduction and Procedural History

Plaintiff applied for DIB on July 30, 2013, (R. 7, PageID.352), and SSI on August 5, 2013, (*id.*, PageID.359). He alleged he became disabled on January 16, 2013. (*Id.*,

PageID.352.)[1] The Commissioner denied the claims. (*Id.*, PageID.148-49.) Plaintiff then requested a hearing before an administrative law judge (ALJ), which occurred March 18, 2015. (*Id.*, PageID.96-122.) The ALJ issued a decision on May 8, 2015, finding that Plaintiff had "engaged in substantial gainful activity . . . from at least January 16, 2013 [*i.e.*, the onset date] through the end of 2014." (*Id.*, PageID.165.) Therefore, the ALJ denied the claim. (*Id.*)

On review, the Appeals Council agreed with the ALJ that Plaintiff's earnings barred him from benefits, but only through the end of 2014. (*Id.*, PageID.173.) Because the ALJ did not consider the period from January 1, 2015, through the decision date, May 8, 2015, the Appeals Council remanded the case to consider that period. (*Id.*, PageID.173-74.)

Another hearing was held, on January 18, 2018, (R. 14, PageID.881-911), followed by an ALJ decision the next month finding Plaintiff was not disabled, (R. 7, PageID.48-70). This time, the Appeals Council denied review. (*Id.*, PageID.34-36.) Plaintiff sought judicial review on October 15, 2018. (R. 1.) The parties have filed cross-motions for summary judgment and briefing is complete. (R. 10, 15.)

### B.    Standard of Review

The court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or

---

[1] That date comes from his DIB application. His SSI application gave November 1, 2011, as the date. (*Id.*, PageID.359.) I will follow the lead of the parties and the ALJ by using the date in the text above. (*Id.*, PageID.49; R. 10, PageID.842; R. 15, PageID.915.)

has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F App'x. 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted). "[T]he threshold for such evidentiary sufficiency is not high. . . . It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* at 286 (internal citations omitted).

### C. Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. § 1382c(a)(3)(A). The Commissioner's regulations provide that disability is to

be determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.
>
> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.
>
> (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.
>
> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.
>
> (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The claimant must provide evidence establishing the residual functional capacity, which "is the most [the claimant] can still do despite [his or

4

her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D.    ALJ Findings

Following the five-step sequential analysis, the ALJ determined that Plaintiff was not disabled. (R. 7, PageID.64.) Consistent with the earlier ALJ decision, the 2018 ALJ decision found that Plaintiff had engaged in substantial gainful activity from January 2013 through December 2014. (*Id.*, PageID.51.) After that period, however, Plaintiff had not engaged in such activity; therefore, the decision dealt "with the claimant's impairments as of January 1, 2015." (*Id.*)

At step two, the ALJ determined that Plaintiff had the following severe impairments: "hip osteoarthritis; bone spur of left femur; sacroiliac joint dysfunction; lumbar spondylosis; chronic obstructive pulmonary disease (COPD); asthma; anxiety; [and] depression." (*Id.*, PageID.53.) At step three, the ALJ determined that he did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment. (*Id.*, PageID.53-55.)

Before proceeding to the final steps, the ALJ found that Plaintiff had the RFC to perform

> light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant can occasionally climb ramps and stairs; occasionally climb ladders, ropes, and scaffolds; occasionally balance and stoop; occasionally kneel[,] and crawl; should never be exposed to unprotected heights and dangerous machinery; occasional exposure to dusts[,] odors[,] fumes and pulmonary irritants; the claimant is limited to performing simple routine tasks; use judgment in the workplace limited to simple work related decisions; the ability to deal with changes in the work setting limited to simple work related decisions; the claimant will need a sit/stand opinion permitting change in position every 30-45 minutes, if needed and without disturbing the workplace; the claimant requires a cane to ambulate during the work day.

(*Id.*, PageID.55.) Moving on to step four, the ALJ concluded that Plaintiff could not perform any past relevant work. (*Id.*, PageID.62.) Finally, at step five, the ALJ noted various jobs existing in significant numbers nationally that Plaintiff could perform, all of which were sedentary-level jobs: final assembler, mounter, and sorter. (*Id.*, PageID.62-64.)

### E.    Administrative Record

#### 1.    Medical Evidence

The medical record begins with a trip to the emergency room in June 2011 to treat pain in Plaintiff's right ankle. (*Id.*, PageID.516.) An x-ray failed to reveal any abnormalities. (*Id.*, PageID.517.) On examination, he could successfully rise from a chair in one push, although he had arrived in a wheelchair. (*Id.*, PageID.513.) Besides the pain, no other abnormalities were listed in the report. (*Id.*, PageID.512-13, 516.)

In November 2012, Plaintiff saw a therapist at Team Mental Health Services (TMHS). (*Id.*, PageID.520, 550.) Before then, he had received no mental-health treatment. (*Id.*, PageID.546.) Plaintiff presented with depression and explained his history of suicidal

ideation, insomnia, racing thoughts, visual and auditory hallucinations, and paranoia. (*Id.*, PageID.520, 546, 550.) The depression began in 2009 after his cousin was killed in a car accident. (*Id.*, PageID.550.) At the time of the session, he lacked medical insurance and had needs involving housing, income (as he was unemployed), and transportation. (*Id.*, PageID.520-21, 546.) While he engaged in substance abuse, he was not dependent on substances and also reported that, presently, he seldom drank. (*Id.*, PageID.546.) Plaintiff had a sad demeanor but was properly oriented, and displayed connective insight, intact judgment, average intellectual functioning, euthymic mood, and congruent affect. (*Id.*, PageID.550.) He reported being capable of "complet[ing] all of his activities for daily living without assistance." (*Id.*, PageID.551.) He enjoyed spending time with his children and was good at "working on cars," but he was not involved in any community activities. (*Id.*)

At another examination the same month, the therapist wrote that Plaintiff "demonstrated good grooming, timeliness," proper orientation, sadness, happy interactions, calmness, normal speech, "intact judgment, logical and coherent thought process, non-command auditory hallucinations, visual hallucinations, paranoid delusions, fair insight, no obsessive thought[,] and below average intelligence." (*Id.*, PageID.547.)

At a TMHS therapy session later that month, Plaintiff had "Good" behavior, input, and appearance, and average attentiveness and overall participation. (*Id.*, PageID.543.) Later that month he mentioned his plan to "go back to school after completing treatment for his recovery." (*Id.*, PageID.538 (quotation marks omitted).) His "upmost concern is employment," a report noted, and he had received several "leads" on jobs from a peer at

TMHS. (*Id.*, PageID.537.) Plaintiff failed to show for the next few appointments at TMHS. (*Id.*, PageID.544-45.)

On January 31, 2013, Plaintiff underwent a medical evaluation by Dr. Bina Shaw, an internist. (*Id.*, PageID.569.) The focus was Plaintiff's left hip, which he had fractured from falling off a ladder in 2002. (*Id.*) He reported that it took six months after the accident to begin walking. (*Id.*) But the pain remained with "prolonged walking, crawling or crouching," or squatting. (*Id.*) He also experienced left knee pain due to osteoarthritis. (*Id.*) The pain, however, was "mild." (*Id.*, PageID.574.) Though he sprained his right ankle in 2011, it "does not bother him much." (*Id.*, PageID.569.) He denied pain in his lower back, shoulders, neck, wrists, and hands, and also denied any neurological or respiratory problems, such as shortness of breath or breathing difficulty. (*Id.*, PageID.569-70.) The following were found on examination: his neck was supple with full range of motion; he had full range of motion in his cervical and thoracolumbar spine; there were no muscle spasms or midline spine tenderness; straight leg raise tests were negative "at 40 degrees in supine position"; he had full range of motion in his hips, knees, ankles, shoulders, elbows, and wrists; his gait was steady without limp (although he brought a cane); he was alert and properly oriented; Romberg test was negative; his deep-tendon reflexes were normal; his muscle strength was normal; and he could "get off of the table and chair without any assistance." (*Id.*, PageID.570-71.)

Overall, Dr. Shaw opined that Plaintiff "has no significant functional impairment. The patient can sit, stand, walk, bend and lift at least 15 pounds of weight without difficulty eight hours a day." (*Id.*, PageID.571.) In addition, under the "Impression" portion of the

report, Dr. Shaw wrote that Plaintiff "currently complains of mild left hip pain and left knee pain; Rule out osteoarthritis. He does not need to use a cane." (*Id.*)

On July 9, 2013, Plaintiff went to the emergency room with left-hip pain. (*Id.*, PageID.583.) The pain was severe, but had a "dull" quality and he "had no pertinent positive symptoms." (*Id.*, PageID.584.) On examination, his cardiovascular and respiratory systems were normal; he had limited hip and knee movements; his hip flexion strength was four-out-of-five but otherwise he had full strength on all muscle groups; and his "[m]otor and sensation [were] grossly intact in all extremities." (*Id.*, PageID.585.) The doctors thought the pain resulted from his 2002 accident, and they sent him home after prescribing medication. (*Id.*)

A couple weeks later he followed up with Dr. Richard Brown. (*Id.*, PageID.592.) The pain continued, and he also complained of nervousness and tremors in his right hand. (*Id.*) But the examination was "normal," as his lungs were clear, his nerves intact, and his reflexes, gait, "motor," "sensory," and "vibratory" were normal. (*Id.*)

Left-hip pain sent him to the hospital again in August 2013. (*Id.*, PageID.601.) But he denied other orthopedic or constitutional problems, respiratory issues, musculoskeletal troubles, neurologic problems, weakness in his lower leg, depression, or hallucinations. (*Id.*, PageID.601, 604, 607-08.) In addition, he noted that he could walk and had "just . . . a little bit of a limp." (*Id.*, PageID.604.) His judgment seemed good and he was cooperative. (*Id.*, PageID.607.)

While at the hospital he underwent multiple examinations. One found pain on palpitation and resistance to movement in the hip. (*Id.*, PageID.602.) Another observed

significant tenderness in the hip, but no pain with rotation, negative straight-leg raise tests, four-out-of-five strength on hip flexion, full strength in knee extension and flexion, and "full range of motion of all lower extremity joints." (*Id.*, PageID.605.) Yet another examination produced normal results (except perhaps for the neurologic portion, which stated "Normal, Focal sensory deficit"). (*Id.*, PageID.608.) X-ray results were unremarkable. (*Id.*, PageID.602, 605, 617, 692, 694.) The doctor diagnosed left hip trochanteric bursitis and possible "hardware pain" resulting from his 2002 surgery for the fracture. (*Id.*) The report also stated that Plaintiff's "main concern" was returning to work, as his hip pain had been "debilitating and interfering with his ability to keep employment." (*Id.*, PageID.601.) He could not work now, he related. (*Id.*, PageID.604.)

While at the hospital, he was sent for a psychiatric evaluation. (*Id.*, PageID.605.) The results were largely normal, *e.g.*, good judgment, normal affect, goal-directed thoughts, cooperative, and no hallucinations. (*Id.*, PageID.609.) The only abnormality was limited insight. (*Id.*) He was assessed with depression, but he did not meet criteria for inpatient care or commitment. (*Id.*, PageID.609-10.)

Plaintiff had another mental status evaluation—this one for his disability claim—in September 2013. (*Id.*, PageID.620.) He explained that after his 2002 accident he continued to work until 2007, when his pain and restricted movements forced him to quit. (*Id.*) Since then he had "done some work out of his home cutting hair and babysitting." (*Id.*) It was the hip, knee, and leg pain, as well as shaky hand, that prevented him from working. (*Id.*, PageID.621.) Regarding past mental health treatment, he mentioned attending TMHS but admitted he had not gone there for a while and he was inconsistent taking prescriptions.

10

(*Id.*, PageID.620.) Currently, he received no treatment. (*Id.*) The evaluator, Dr. Nick Boneoff, noted that Plaintiff "was very inconsistent with his reports," noting for example that he both denied and admitted past drinking problems and a criminal record. (*Id.*)

At the time of the evaluation, Plaintiff lived with a friend and continued babysitting his children. (*Id.*, PageID.621.) He could dress, shower, and prepare simple meals. (*Id.*) Because he lacked a driver's license, he took public transportation. (*Id.*) Most days he watched television and played board games with his friend. (*Id.*)

Dr. Boneoff noted that Plaintiff did not use a cane or walker but had a "slight limp. He was able to climb up a flight of stairs, and then sat comfortably on his chair." (*Id.*) Plaintiff's affect was dull, his mood calm. (*Id.*, PageID.622.) Although he was a poor historian, he was logical and spoke without "any pressured speed, tangential or loose thinking." (*Id.*) He denied hallucinations and paranoia, complaining only of depression. (*Id.*) Overall, Dr. Boneoff concluded, there was not enough evidence "to suggest that any type of psychiatric symptoms, cognitive impairments or problems with short-term working memory or concentration would interfere with [Plaintiff's] ability to do work-related activities." (*Id.*, PageID.623.) In support, Dr. Boneoff noted that Plaintiff was "generally independent with his [activities of daily living]," could care for his children, and got along with family. (*Id.*)

In September 2013, the Commissioner had agency consultants review the extant record. (*Id.*, PageID.129-47.) Dr. Kathy Morrow assessed the mental-health evidence. She concluded that Plaintiff had mild restrictions in daily activities and social functioning; moderate difficulties carrying out detailed instructions and maintaining concentration,

persistence, or pace; and no significant limitations with understanding, memory, carrying out simply and short instructions, and performing a routine punctually without supervision and without being a distraction or distracting others. (*Id.*, PageID.129, 132.) Dr. Muhammad Mian examined the physical-health materials. He provided the following RFC: Plaintiff could occasionally (up to 1/3 of an 8-hour workday) lift 20 pounds; frequently (up to 2/3s) lift 10 pounds; stand and/or walk for up to 6 hours and sit for up to 6 hours during the 8-hour workday; he had no restrictions pushing or pulling (including using hand or foot controls); he could occasionally climb ramps, stairs, ladders, ropes, and scaffolds; he could occasionally balance, stoop, kneel, crouch, and crawl; and he had no manipulative, visual, communicative, or environmental limitations. (*Id.*, PageID.131.)

Plaintiff returned to Dr. Brown every month from August to November 2013. (*Id.*, PageID.627-33.) Injections into his hip did not help and he continued to experience stiffness and pain, he reported. (*Id.*, PageID.627, 629, 632) The examination results were normal; particularly, his lungs were clear; his motor, sensory, and vibratory systems were normal; and his gait and reflexes were normal too. (*Id.*, PageID.627, 629, 632-33.)

Plaintiff was seen at an orthopedic clinic in September 2013. (*Id.*, PageID.681.) He again claimed that hip injections failed to provide lasting relief. (*Id.*) The pain persisted, making it difficult to walk. (*Id.*) He also had "decreased strength with going up and down stairs. He feels very weak in his left leg and has to use a cane in the morning when he first begins to ambulate." (*Id.*) He had hip pain on palpation and also with rotation, "decreased range of motion rotationally in both directions, [and] also profoundly decreased hip flexion." (*Id.*, PageID.682.) Straight-leg raise tests were positive this time, and his hip

strength was at two-out-of-five on the left but full on the right. (*Id.*) He was prescribed Neurontin. (*Id.*, PageID.677.)

Back at the clinic in December, he reported that the Neurontin "minimally affected his pain." (*Id.*) He estimated that he could walk for about 25 to 30 minutes. (*Id.*) The pain was worse in the morning, but it improved throughout the day did not shoot down his left leg. (*Id.*) On examination, Plaintiff's sensation was intact, he could dorsiflex and plantar flex his extremities, his legs had normal strength, he could extend and flex his hips, and he could walk (without wide gait) and turn around without a cane or walker. (*Id.*, PageID.677-78.) Throughout the examination, however, he was "minimally weaker on his left side" in all movements. (*Id.*) Dr. Paul Dougherty, who examined Plaintiff, wrote that it was "[u]nclear why this patient is experiencing increasing pain at this time." (*Id.*, PageID.678.)

In January 2015, Plaintiff sought treatment for depression, anxiety, and insomnia at the Northeast Guidance Center. (*Id.*, PageID.696.) But he only completed "an initial intake assessment," never returning for treatments. (*Id.*) Consequently, he was discharged in March 2015. (*Id.*) A report from the initial assessment was completed, however. (*Id.*) In it, he stated that his depression began after he fractured his hip. (*Id.*) He denied substance abuse. (*Id.*) He reported possible auditory and visual hallucinations. (*Id.*) Aside from his hip problems, he denied other medical issues. (*Id.*) Recently, he had obtained medical insurance. (*Id.*) He could make "all choices independently," had a "positive bond with his mother and kids," had a good support circle, enjoyed doing puzzles and playing computer games, and was good with computers. (*Id.*, PageID.699-700.) He also liked spending time with his children, helping them with homework, playing with them, and taking them to the

park. (*Id.*, PageID.713.) He was independent in daily activities, including eating, dressing, using the bathroom, grooming, taking medications, walking, "transferring," and "mobility in community." (*Id.*, PageID.707.) He could go to stores, the movies, restaurants, banks, and the post office, among other places, alone or with others. (*Id.*, PageID.714.) The report also indicates that he had a history of asthma, but it had not been treated in the past year, and he never had upper respiratory infections. (*Id.*, PageID.710.) Xanax helped his symptoms, he reported. (*Id.*, PageID.712.) Plaintiff also stated that he had been in special education in school and had dropped out after the tenth grade. (*Id.*, PageID.713.) He last worked in 2007, and he noted he "would like to get a job." (*Id.*) The interviewer observed Plaintiff's depressed mood, normal concentration, fair judgment, unremarkable thought content and processes, normal communication efficiency, and normal stream of mental activity. (*Id.*, PageID.696, 702, 706.) He was assessed with depression. (*Id.*, PageID.720.)

In early 2015, Plaintiff had a CT scan of his left hip. (*Id.*, PageID.751.) The overall impression was that the surgical hardware remained in place with "[n]o evidence of complications." (*Id.*) The findings section of the report noted "[m]ild degenerative changes." (*Id.*)

In February 2015, Plaintiff began seeing Dr. Meraj Yunus. (*Id.*, PageID.750.) The records of their appointments run through May 2017. (*Id.*, PageID.728-50, 780-801.) At the first recorded visit, Plaintiff reported a history of COPD, but stated that he had been breathing "fairly well" despite occasional shortness of breath. (*Id.*, PageID.750.) He also complained of gastroesophageal reflux disease (GERD). (*Id.*) But he did "very well" when he took his medications, and his blood-pressure medications worked "fine." (*Id.*; *see also*

14

*id.*, PageID.741-46; *see also* 734 ("Patient continues to do well with the depression medicine, patient seems happier, more energetic, sleeping and eating better, denies any problem with the meds."), 739 ("Patient continues to do well with the medicine, patient seems to be happier, more energetic, sleeping and eating better, denies any problems with the meds."), 748 (same).) Later, he added complaints of abdominal pain, leg pain due to neuropathy, nausea, fatigue, anxiety, and back pain. (*Id.*, PageID.728, 738, 739, 743, 745, 746, 748.) Yet, even when complaining of back pain, he often denied experiencing weakness or numbness. (*Id.*, PageID.728, 730, 732, 737, 739, 742, 743, 745.) Pain medications helped the back pain, but they eventually wore off. (*Id.*, PageID.728.)

In March 2016, Dr. Yunus's report mentioned that, regarding Plaintiff's asthma, he "has been doing very well with infrequent cough/wheezing attacks. [Plaintiff] had to use . . . inhalers only a few times a month and it relieved the symptoms completely." (*Id.*, PageID.730.) After an identical report the following month, the doctor wrote that Plaintiff's "activity is not restricted due to the asthma." (*Id.*, PageID.728.) In August 2016, he denied shortness of breath related to his anxiety. (*Id.*, PageID.723; *id.*, PageID.789 (same), 794 (same).)

During most examinations with Dr. Yunus, Plaintiff's lungs were clear, his lumbar region was tender to the touch with some spasming, straight-leg raises were negative, his mood and affect were normal, and he had no vertebral tenderness or sensory, motor, or vascular deficits in his legs. (*Id.*, PageID.728, 732, 737-39, 743, 745, 746, 748, 750; *see also id.*, PageID.724 (no physical abnormalities noted but no recording musculoskeletal examination), 734 (same), 740 (same), 741 (same), 744 (same), 790 (same), 795 (same).)

Sometimes, his abdomen was tender. (*Id.*, PageID.748.) In many, if not most, of Dr. Yunus's reports, he wrote that the statuses of the low back pain, leg pain, and anxiety that Plaintiff claimed were "Not Indicated," suggesting he did not find objective evidence to support Plaintiff's complaints of these conditions. (*Id.*, PageID.724, 726-27, 781-82, 784-85, 787-88, 790, 793, 795, 797, 799, 801; *but see id.*, PageID.724, 790, 795 (finding unspecified low back pain).) On another occasion, "some parasthesias" was noted in his legs, but sensation was "somewhat preserved," there were not motor deficits, and his legs had normal range of motion. (*Id.*, PageID.746.) At numerous sessions, his back had "somewhat limited" range of motion due to pain; but even then, his straight-leg raises were negative and he had no motor or other deficits in his legs. (*Id.*, PageID.730, 732, 737-39, 742, 743, 745, 746.)

A CT Scan of Plaintiff's lumbar spine is included in Dr. Yunus's materials. (*Id.*, PageID.814-15.) It revealed "[n]o acute fracture or subluxation," "[c]ongenital mild spinal canal narrowing and associated decreased foraminal AP diameter," and "moderate degenerative changes of the sacroiliac joints." (*Id.*, PageID.814.)

In May and September 2016, Plaintiff's respiratory, cardiovascular, and neurologic systems were normal on examination by Dr. Yunus. (*Id.*, PageID.726, 801.) At those appointments, the examination notes for his musculoskeletal system state, in full, "Abnormal: - Muscle Spasm: - Gait & Statute: - unsteady and hunchback." (*Id.*) But in October 2016, Plaintiff complained of leg pain without mentioning back pain. (*Id.*, PageID.798; *see also id.*, PageID.792 (same for January 2017).) By the following month, however, he claimed back pain and weakness; the examination notes again stated,

"Abnormal: - Muscle Spasm: - Gait & Statute: - unsteady and hunchback," although all other systems were normal. (*Id.*, PageID.797; *see also id.*, PageID.781 (same, May 2017), 784 (same, April 2017), 787 (same, March 2017).)

The last medical report comes from Dr. Mohamed Osman, who examined Plaintiff in October 2017. (*Id.*, PageID.822-30.) Plaintiff wrote on the intake form that the reason for the appointment was to "start back getting my pain medication." (*Id.*, PageID.826.) The pain resulted from his 2002 fall, and began in his left hip and knee. (*Id.*) The pain was constantly unbearable, at 10-out-of-10. (*Id.*, PageID.827.) It usually limited his sleep to around four hours a night. (*Id.*) In the past, Norco had helped with the pain for about three to four hours at a time. (*Id.*, PageID.828.) Plaintiff also noted his medical history of depression and anxiety, but did not select various other diagnoses available on the sheet, including asthma, COPD, high blood pressure, or GERD. (*Id.*, PageID.829.) Of various symptoms, he noted muscle cramps, anxiety, depression, and difficulty sleeping, but not headaches, chronic fatigue, general weakness, dizziness, shortness of breath, incoordination, tingling, numbness, difficulty concentrating, difficulty walking, or daytime sleepiness. (*Id.*, PageID.830.)

Dr. Osman noted that a recent CT of Plaintiff's hip and leg revealed "[m]inor degenerative spurring left hip joint. Intact hardware through the proximal left femur. . . . Bony excrescence along the proximal lateral aspect of the tibia likely related to old injury. . . . Stable degenerative changes left sacroiliac joint." (*Id.*, PageID.822.) On examination, Plaintiff's respiratory and cardiovascular systems were normal. (*Id.*, PageID.824.) Regarding the lumbosacral spine, Plaintiff had tenderness but no subluxations, the spinal

range of motion was normal, muscle strength and tone were within normal limits, the straight-leg raise test was negative, the femoral stretch test was negative, Waddell signs were not present, and the FABER and Gaenslen tests were positive. (*Id.*)

A thorough examination of Plaintiff's legs was also recorded. Other than point tenderness in Plaintiff's left hip and knee, and a somewhat slow-paced walk, Plaintiff's legs were normal; in particular, joint stability was within normal limits, the gait was normal (but slow, as noted), the range of motion was normal, no joint crepitations were present, and no pain on motion was noted. (*Id.*) Plaintiff's pelvis had no abnormalities. (*Id.*) Likewise, an extensive neurologic examination revealed no abnormalities; notably, Plaintiff's strength, motor function, gait, reflexes, and muscle tone were all normal. (*Id.*) Dr. Osman assessed hip osteoarthritis, bone spur of the left femur, sacroiliac joint dysfunction, and lumbar spondylosis. (*Id.*) Plaintiff received a prescription for pain medications, including Norco. (*Id.*, PageID.824-25.) Injections were discussed and an appointment requested to administer them. (*Id.*, PageID.825.)

### 2.    Function Report

Plaintiff completed a Function Report in August 2013 for his disability application. (*Id.*, PageID.440-47.) The reason he could not work, he explained, was his leg: it would "[g]ive out," he could not stand for long, and he needed "to sit down for a while" when his muscles tightened. (*Id.*, PageID.440.) Asked what he did on a typical day, he wrote, "Have a hard time going to sleep, just think all day cause I can't work." (*Id.*, PageID.441.) As for personal care, his condition affected him at two times: when he lowered himself into the bathtub and when he bent down to use the toilet. (*Id.*) He did not need any reminders

18

regarding personal care or his medications. (*Id.*, PageID.442.) Because he could not stand for long, he cooked only once a month, and it took two hours. (*Id.*) Around the house he could do laundry, iron, and take out the trash, all of which took him over an hour every five days. (*Id.*) He needed reminders to complete these tasks, however. (*Id.*) About every other day he left the house, using public transportation to get around. (*Id.*, PageID.443.) He could go out alone. (*Id.*) Once a month he shopped for food, which took him about two hours. (*Id.*) He could count change, but because he lacked income he reported being unable to pay bills, handle a savings account, or use checkbooks or money orders. (*Id.*) He was able to maintain his hobbies of watching television and completing puzzles, which he did every day. (*Id.*, PageID.444.) He also played games with his children every week and attended their sporting events. (*Id.*)

Plaintiff indicated that his condition affected the following abilities: lifting (no more than five pounds), squatting, bending, standing, walking (no more than two blocks, before needing a ten-minute break), sitting, kneeling, climbing stairs, and completing tasks. (*Id.*, PageID.445.) While he did not select the option to indicate problems with concentration or following instructions, he noted that he could pay attention only "[f]or a minute," and he could not follow written instructions well. (*Id.*) He could, however, follow spoken instructions "[a]lright," and he got long well with authority figures. (*Id.*, PageID.445-46.) Stress and changes in his routine were difficult for him. (*Id.*, PageID.446.) "When waking up," he used a cane he got from a friend. (*Id.*)

### 3.    2015 ALJ Hearing

Plaintiff's first ALJ hearing occurred on March 18, 2015. (*Id.*, PageID.96-122.) Plaintiff testified that he completed schooling through the tenth grade, in special education classes, and later obtained his GED. (*Id.*, PageID.99-100.) At some point after he had become disabled, in January 2013, Plaintiff worked at Dollar Tree for around ten hours a week. (*Id.*, PageID.100.) Yet his conditions prevented him from continuing that job, and he lasted for only four weeks or so. (*Id.*, PageID.101, 103.) In particular, standing at work was too difficult, as his hip muscles would tighten. (*Id.*, PageID.103.) Due to the pain, he had been using a cane for around two years to help him walk and stand. (*Id.*, PageID.103-04.) Even around the house, he used the cane. (*Id.*, PageID.109.) He was right-handed and so he used his left to hold the cane. (*Id.*, PageID.103.)

He could stand for "a good 20 minutes," and walk a block with his cane before his "muscle starts acting up." (*Id.*, PageID.113.) Then he would need a ten-minute break. (*Id.*, PageID.113-14.) As for lifting, his maximum was 10 pounds. (*Id.*, PageID.114.) Without elevating his leg, he could sit for 40 minutes, at which point he would have to "move it, bend it back and forth," and massage it. (*Id.*, PageID.114-15.)

For leg pain, he took Norco twice a day. (*Id.*, PageID.104.) With that medication, his leg pain was at six- or seven-out-of-ten; without it, the pain was at eight or nine. (*Id.*, PageID.105.) None of his medications caused side effects. (*Id.*) Although the pain stemmed from his 2002 accident, its onset was gradual and it grew worse over a period of years. (*Id.*)

At the time of the hearing, he lived with his mother, who did most household chores. (*Id.*, PageID.106.) Plaintiff could do light work, such as taking out the trash, washing

20

dishes, and sweeping the floor. (*Id.*) But he completed these tasks in ten-minute bursts punctuated by rest breaks, during which he sat and stretched or massaged his leg. (*Id.*) He also used gels and elevated his leg, a position he maintained for about half the day. (*Id.*, PageID.106-08.) The pain peaked in the morning when he awoke. (*Id.*, PageID.109.)

The pain disrupted his sleep, limiting him to around four-and-a-half hours a night. (*Id.*) To catch up, he napped during the day for around an hour and a half. (*Id.*) His depression also affected his sleep. (*Id.*, PageID.110.) During spells of high anxiety, his heart palpitated and he would sweat; an episode would usually last 20 minutes and occur every other day. (*Id.*, PageID.111-12.) His depression also caused self-isolation and concentration problems. (*Id.*, PageID.112.) For example, he could not finish a half-hour TV show without his attention wandering off to other things. (*Id.*) And his memory was affected too—again, for example, during a TV program he would "forget some, like some of the parts I didn't seen [*sic*], half of the like the parts I didn't seen." (*Id.*, PageID.113.)[2]

### 4.   2018 ALJ Hearing

The second hearing occurred in January 2018. (R. 14.) Plaintiff testified that his self-employment income from 2012 through 2014 was earned cutting hair at a barber shop. (*Id.*, PageID.885-86.) At the job, he needed to stand for only an hour or so and the heaviest object he lifted weighed less than five pounds. (*Id.*, PageID.886.) In 2015, his income again came from cutting hair, but eventually he stopped because of left hip and knee pain, back pain, and his leg giving out, leading to falls. (*Id.*, PageID.887.) In 2016, he worked part-

---

[2] A vocational expert (VE) testified, but because the ALJ relied on the VE's statements at the more recent, 2018 hearing, I will not recount the earlier testimony. (*Id.*, PageID.116-21.)

time for the Department of Community Health and Home, helping to take care of his aunt. (*Id.*, PageID.886-87.) She prepared her own meals, but he would wash and fold clothes and help clean up. (*Id.*, PageID.887-88.) At the time of the hearing, he was not working. (*Id.*, PageID.886.)

He again cited pain in his left hip and knee, along with his lower back, as the basis for claiming disability. (*Id.*, PageID.888.) Since the prior hearing, his hip and leg had deteriorated. (*Id.*, PageID.895.) The pain was worse and his leg gave out more often. (*Id.*) He could barely bend his left knee. (*Id.*, PageID.895-96.) Dr. Osman had set him up with physical therapy, but "that didn't change nothing," nor did the injections. (*Id.*, PageID.896.) The Norco helped only "a little bit." (*Id.*) Normally, his pain was at eight- or nine-out-of-ten; with the Norco it went to six or seven. (*Id.*, PageID.896-97.) The pain and depression continued to play havoc with his sleep, limiting him to three hours most nights and none on others. (*Id.*, PageID.900.) But he no longer napped during the day. (*Id.*)

He could sit for only around 10 minutes at once, but at home he spent most of the day sitting with his leg elevated. (*Id.*, PageID.898-900.) With the cane, he could stand for 20 minutes and walk half a block. (*Id.*, PageID.899.) The most he could lift, from the counter or the ground, was 10 pounds. (*Id.*, PageID.899-900.) If he tried lifting more, his back hurt. (*Id.*, PageID.900.)

He used a cane all the time, including at the hearing. (*Id.*, PageID.888) He had used it for two years, but recently was prescribed a new one by Dr. Osman a few months earlier. (*Id.*, PageID.891-92.) Originally, Dr. Yunus had prescribed the cane. (*Id.*, PageID.893.) The cane helped him walk and stand, as his leg had given out during both activities. (*Id.*)

Unlike his previous testimony, when he said he held the cane in his left hand, he now testified that he used his right to grasp the cane. *Compare* (*Id.*, PageID.893), *with* (R. 7, PageID.103.)

For his breathing issues, he took asthma medication. (*Id.*, PageID.888-89.) Depression and anxiety caused crying, shaking, and sweating, about four times a week. (*Id.*, PageID.889.) Panic attacks struck three or four times a week, each one lasting half a day. (*Id.*, PageID.894.) He had treated at "Northeast" for mental health issues, but it stopped taking his insurance. (*Id.*, PageID.889.) Presently, he was not receiving any counseling, although he was searching for someone who would accept his insurance. (*Id.*, PageID.889-90.) He did, however, take Xanax and Cymbalta for the depression and anxiety. (*Id.*, PageID.897-98.)

He could manage his personal needs, and noted in particular that he could bathe and dress "when I'm not going through depression." (*Id.*, PageID.891.) But about five times a month, someone would need to remind him to take care of his hygiene. (*Id.*, PageID.894.) For food, he was able to prepare small meals like sandwiches. (*Id.*) During a typical day he watched television, played videogames on his phone, and attended doctor's appointments, which was the only reason he would leave the house. (*Id.*, PageID.891, 902.) He had only one friend and no significant other, but he did not have trouble getting along with others. (*Id.*, PageID.901.) He could not do chores around the house; his cousin and mother took care of everything. (*Id.*, PageID.892.) He did not do laundry, vacuum, sweep, or complete any outdoor work. (*Id.*, PageID.901.02.)

23

The ALJ then asked the vocational expert (VE) to imagine the following hypothetical individual who had

> the claimant's age and education with the past job [as a barber] . . . and further this individual can perform work at the light exertional level with the following limitations. Occasionally climb ramps and stairs. Occasionally climb ladders, ropes and scaffolds. Occasionally balance and stoop. Occasionally kneel, crouch and crawl. Never be exposed to unprotected heights and dangerous machinery. Occasional exposure to dust, odors, fumes and pulmonary irritants. Limited to perform simple, routine tasks. Use judgment in the workplace limited to simple work related decisions. Deal with changes in the work setting limited to simple work related decisions.

(*Id.*, PageID.905.) Could that person do any of Plaintiff's past work, the ALJ asked. (*Id.*) No, the VE replied, but the person could do other jobs: cleaner and polisher (26,670 positions nationally), finish inspector (15,450 positions), and garment sorter (45,150 positions). (*Id.*, PageID.906.)

For the second hypothetical, the ALJ added to the first individual a "sit/stand option permitting change in position every 20 to 30 minutes if needed and without disturbing the workplace." (*Id.*) No positions would be available, the VE stated, but if the "sit/stand option" was for "every 30 to 45 minutes without interrupting or disturbing the workplace," the individual could do all the jobs listed above in the same numbers. (*Id.*, PageID.907.)

For the third hypothetical, the ALJ took the individual from the second hypothetical (with 30 to 45 minutes for the sit/stand option) and added "that this person would require a cane to ambulate during the workday." (*Id.*) No positions were available at the light-work level, but at the sedentary level, the following jobs could be performed: final assembler (207,200 positions nationally), mounter, clock and watch industry (72,210 positions), and sorter (248,810 positions). (*Id.*, PageID.907-08.)

24

For the fourth hypothetical, the ALJ began with the restrictions from hypothetical three and added that the individual "would not have the persistence, pace or concentration to perform simple routine tasks out of an eight hour day, five day a week, 40 hours a week or equivalent basis or this individual would be off task 20% of the time or this individual would be absent three or more days a month due to impairments." (*Id.*, PageID.908.) Such an individual, the VE concluded, could not perform any jobs. (*Id.*, PageID.908-09.)

The VE explained that the typical off-task time is between 10 and 15 percent and the typical number of days missed (presumably per month) is one or two. (*Id.*, PageID.909.) The VE also stated that if the individual needed to use "a cane for the standing portion of the sit/stand option," he or she could not perform the jobs above because they are "upper extremity oriented and obviously use of a cane for balance and ambulation would eliminate one hand." (*Id.*) Further, no jobs would be available if the individual needed to elevate their legs to the hip level while sitting. (*Id.*, PageID.910.)

### F.    Law and Analysis

Plaintiff presents four arguments[3]: (1) the ALJ should have gotten an updated medical opinion to review the new materials produced after the agency consultants last reviewed the record, in 2013; (2) the ALJ erred by failing to credit Plaintiff's persistence in seeking pain relief, as required under Social Security Ruling (SSR) 96-7p; (3) the ALJ violated SSR 96-8p by not providing a narrative discussion citing evidence to support the RFC and by not including a function-by-function assessment; and (4) the ALJ erred by

---

[3] He actually slices them into five, but the third and fifth arguments are better lumped together.

concluding that Plaintiff can work at the light-exertional level despite "unrebutted evidence that Plaintiff uses a cane for ambulation." (R. 10, PageID.838-39.) I will address each argument separately below.[4]

### 1.    Updated Medical Opinion

Plaintiff first argues that the "ALJ erred by not obtaining a medical advisor as required by SSR 96-6p," given all the new materials produced since the agency consultants, Dr. Morrow and Dr. Mian, reviewed the record in September 2013. (R. 10, PageID.857-58.) The initial branch of his argument seeks to measure how much the record fattened with new evidence:

> Since September, 2013, 33 pages from Park Medical Center (Doc. 7-7, Tr. 606-638); 26 pages from the Guidance Center (Doc. 7-7, Tr. 658-683); 55 pages from Adult & Pediatric Medicine (Doc. 7-8, Tr. 684-738); and 10 pages from University Pain Clinic of Rochester (Doc. 7-8, Tr. 782-791) have been added to the record, including the results of a CT scan (Doc 7-8, Tr. 783-786). In addition, since the consultative examiners documented their opinions on September 18, 2013, there have been four years of treatment records that were not reviewed by any consultive [*sic*] examiners and are evidence of a change in medical condition.

(*Id.*)[5]

---

[4] These arguments take up nearly 28 pages in the brief. That is three pages more than our local rules allow, unless the party obtains permission for the excess. E.D. Mich. LR 7.1(d)(3). Plaintiff never asked for the extra space here, but it would hardly make the Court's job easier to lop off his brief at page 25. Instead, I would simply remind Plaintiff's counsel of the page limits and advise that future violations might not be met with mere reminders.

[5] Plaintiff also states: "Such testimony [*i.e.*, a new medical opinion] was needed given the voluminous new medical evidence added to the record since a State agency psychological consultation and physical consultation on September 18, 2013. The ALJ does not note the Exhibits of these two consultative examinations in her decision [R. 7, PageID.61] nor are they included with the Exhibits." (R. 10, PageID.857.) This assertion is incorrect on multiple counts. For one thing, it appears Plaintiff is talking about the two agency consultants who reviewed the records in September 2013, Dr. Morrow and Dr. Mian, (R. 7, PageID.129-35), but they never examined Plaintiff and so he is wrong to mention "two consultative examinations." Further, the very page he cites from the ALJ's opinion analyzes the consultant's opinions. (R. 7, PageID.61.) Perhaps he means that the evidence is absent from the exhibit list appended to the ALJ

Putting aside SSR 96-6p for the moment, the first thing to note about this part of Plaintiff's argument is that it relies on mere quantification to make its point. But page-counts are just a proxy for the showing Plaintiff tries to make, *i.e.*, that the new materials are complicated enough to warrant a professional's review. Even taking quantity as a starting point, it is worth noting that Plaintiff's reference to an additional four years of medical records—presumably "in addition" to those he already reference—is unaccompanied by any citation to the record. As a result, it is unclear what he is referring to.

Regarding the records he does cite, many of them come from 2013, when he was engaged in substantial gainful activity. (R. 7, PageID.51, 644-76.) A claimant cannot receive benefits for such periods, 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i), and Plaintiff has not challenged the ALJ's finding on this point. The evidence from this period, then, is less helpful to Plaintiff. If anything, it hurts his case, as the ALJ noted that "the record reveals that the claimant's allegedly disabling impairment was present at approximately the same level of severity prior to the alleged onset date to the present." (R. 7, PageID.52.) Plaintiff does not explicitly address this finding in his first argument, but it sets up a rationale for denying benefits: If he participated in substantial gainful activity during a portion of the period covered by the records, and his conditions remained the same

---

decision; but he would be wrong about that too, as the list contains entries for the consultant evaluations, "HO 1A" and "HO 2A" (identical entries corresponding to Plaintiff's two applications, one for DIB and one for SSI). (*Id.*, PageID.65.)

throughout, it would follow that he could engage in such activity after his alleged onset date and after he stopped the activity.

A larger flaw is Plaintiff's reliance on SSR 96-6p. Plaintiff contends that the ALJ violated that Ruling by not obtaining an updated medical opinion. But the Ruling's prescriptions on updated opinions applied only to the step three medical equivalency analysis. Under the Ruling, the Commissioner had affirmed the "longstanding policy requir[ing] that the judgment of a physician (or a psychologist) designated by the Commissioner on the issue of equivalence on the evidence before the administrative law judge or the Appeals Council must be received into the record as expert opinion evidence and given appropriate weight." 1996 WL 374180, at *3 (July 2, 1996). Accordingly, an ALJ had to order an updated opinion "[w]hen additional medical evidence is received that in the opinion of the administrative law judge . . . may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments." *Id.* at *4.

The problem with relying on the Ruling is that the Commissioner has rescinded it, a fact Plaintiff fails to mention. Under the new approach articulated in SSR 17-2p, the ALJ can forego obtaining any medical opinion on equivalency if he or she believes the evidence is sufficient to find against equivalency. 2017 WL 3928306, at *4 (Mar. 27, 2017). Thus, the Ruling "has clarified that an ALJ is not required to obtain a medical expert's opinion before making a finding that an individual's impairments do not meet or equal a listing impairment." *Marvin v. Comm'r of Soc. Sec.*, No. 1:17-cv-330, 2018 WL 4214339, at *3 n.3 (W.D. Mich. Aug. 10, 2018), *Rep. and Rec. adopted by* 2018 WL 4208682 (W.D. Mich.

28

Sept. 4, 2018). The Commissioner's internal guidance informs ALJs that they should order a medical-equivalency opinion only in three limited circumstances: (1) when the Appeals Council or federal court requires one; (2) when the accuracy of test results is questionable and an evaluation of medical test data is needed; and (3) when the ALJ is considering finding equivalency. Hearing, Appeals and Litigation Law Manual (HALLEX), § I-2-5-34, 1994 WL 637370 (April 2016). What is more, under the new Ruling, the ALJ "is not required to articulate specific evidence supporting his or her finding that the individual's impairment(s) does not medically equal a listed impairment." SSR 17-2p, 2017 WL 3928306, at *4.

As such, the entire legal basis for Plaintiff's argument is a defunct Ruling replaced by a regime giving ALJs much greater latitude. It is hard to see how the ALJ here violated SSR 17-2p, which does not require an initial medical opinion on equivalency let alone an update. Plaintiff offers little light on this matter, because he not only ignores SSR 17-2p but makes no effort to address step three or medical equivalency at all. The only mention he makes of these matters comes from a sentence copied *sans* quotation marks from SSR 96-6p. (R. 10, PageID.859.) He does not say which listings he might have equaled or how the new evidence might help him at step three. And it is clear that this case falls outside the three circumstances in the HALLEX that would lead an ALJ to order a new opinion. Consequently, Plaintiff cites the wrong law, then fails to make a relevant argument under that law. And, had he utilized the proper framework in SSR 17-2p and the HALLEX, there

29

would be nothing to argue about because the ALJ was absolved from needing a medical opinion. These are sufficient reasons to reject Plaintiff's first argument.[6]

### 2.     Plaintiff's Efforts to Obtain Pain Relief

Like Plaintiff's first argument, his second contention relies on a rescinded Ruling, SSR 96-7p. (R. 10, PageID.860-62.) That mistake matters less here because the basic proposition Plaintiff plucks from the old Ruling also appears in the new one, SSR 16-3p, 2017 WL 5180304 (Oct. 25, 2017). Both of these Rulings address how the ALJ evaluates a claimant's symptoms, which are defined as the claimant's "own description of [his or her] physical or mental impairment," 20 C.F.R. § 404.1502(i). SSR 16-3p, 2017 WL 5180304, at *2.

In general, the ALJ must first determine whether an "underlying medically determinable physical or mental impairment(s) . . . could reasonably be expected to produce an individual's symptoms, such as pain." *Id.* at *3. Second, the "intensity and persistence of those symptoms" are examined "to determine the extent to which the symptoms limit an individual's ability to perform work-related activities." *Id.*; *see generally* 20 C.F.R. §§ 404.1529, 416.929. In the second step, the ALJ considers "all of the available evidence," 20 C.F.R. §§ 404.1529(a), 416.929(a), a promise the regulation

---

[6] Plaintiff's lone paragraph discussing the new materials fails to persuade me that remand is necessary. The gist of the argument is that the bulk of Plaintiff's treatment for his lumbar spine mental health issues came after the consultants' reviewed the record. (R. 10, PageID.858-59.) Aside from listing his diagnoses, he does not describe any functional limitations they impose. A diagnosis does not, without more, translate into functional restrictions laying the groundwork for disability. *See Hill v. Comm'r of Soc. Sec.*, 560 F. App'x 547, 551 (6th Cir. 2014) ("Disability is determined by the functional limitations imposed by a condition, not the mere diagnosis of it."). Therefore, his recounting of diagnoses does not demonstrate the need for a new medical equivalency opinion.

repeats again with more specifics: "We will consider all the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your medical sources, and observations by our employees and other persons," *id.* §§ 404.1529(c)(3), 416.929(c)(3). Other relevant factors include the claimant's daily activities; the "location, duration, frequency, and intensity of your pain or other symptoms"; treatments and measures used to alleviate the symptoms; "[p]recipitating and aggravating factors"; and the effectiveness of medications. *Id.* §§ 404.1529(c)(3), 416.929(c)(3). Generally, an ALJ's findings on this topic can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

This assessment formerly led to a "credibility" finding. SSR 96-7p, 1996 WL 374186, at *1 (July 2, 1996). But the Commissioner recently "eliminat[ed] the use of the term 'credibility' from our sub-regulatory policy, as our regulations do not use this term. In doing so, we clarify that subjective symptom evaluation is not an examination of an individual's character. Instead, we will more closely follow our regulatory language regarding symptom evaluation." SSR 16-3p, 2017 WL 5180304, at *2. The claimant's "overall character or truthfulness" is not at issue, as it might be in court. *Id.*

Here, Plaintiff argues that his efforts to obtain pain relief were relevant to the ALJ's analysis of his symptoms. (R. 10, PageID.860-62.) That is true. SSR 16-3p provides: "Persistent attempts to obtain relief of symptoms, such as increasing dosages and changing medications, trying a variety of treatments, referrals to specialists, or changing treatment

31

sources may be an indication that an individual's symptoms are a source of distress and may show that they are intense and persistent." 2017 WL 5180304, at *9.

In this case, Plaintiff notes that he "has sought medical treatment for both his lumbar spine and for his mental health conditions since at least 2012." (R. 10, PageID.860.)[7] Regardless, he goes on to explain that he "has tried multiple modalities as well as medications." (*Id.*, PageID.861.) The ALJ ignored this, Plaintiff claims, and instead compared Plaintiff's statements in his 2013 application to his current statements to find inconsistencies. (*Id.*) This mode of analysis ignored the passage of over four and a half years between the statements, during which time his condition deteriorated. (*Id.*) "The very nature of worsening medical conditions would make those statements inconsistent." (*Id.*) The ALJ instead "should have recognized his consistent treatment and increased treatment including a CT scan performed in 2015 and seeking medical treatment with a pain clinic in 2017 as to enhance his credibility." (*Id.*, PageID.861-62.)

Plaintiff's argument fails to convince. As an initial matter, the ALJ did provide a thorough analysis of Plaintiff's efforts to obtain effective treatment. The ALJ noted, for example, Plaintiff's medications, injections, and counselling. (R. 7, PageID.55-57.) The ALJ also mentioned Plaintiff's allegations of worsening pain and deteriorating leg issues. (*Id.*, PageID.56.) Contrary to Plaintiff's suggestion, the ALJ discussed the 2015 CT scan and extensively described Plaintiff's treatments at the pain clinic in 2017. (*Id.*, PageID.58-

---

[7] Of course, it should be noted that in his prior argument, Plaintiff suggested that most of his lumbar-spine treatment occurred beginning in 2015. (*Id.*, PageID.858-59.) It is also worth point out that Plaintiff cites the record only once in this entire argument, and only to prove that many years had elapsed between his 2013 Function Report and the 2018 ALJ hearing. (*Id.*, PageID.861 (citing R. 7, PageID.415-454).)

60.) Indeed, Plaintiff does not describe any evidence that the ALJ ignored, nor does he attempt to paint (with citations to the record) a longitudinal picture of his treatments. To the extent Plaintiff merely disagrees with how the ALJ weighed the evidence, this Court can offer no relief. *See Mullins v. Sec'y of Health & Human Servs.*, 680 F.2d 472, 472 (6th Cir. 1982) ("Our task is not to reweigh the evidence. That is solely the province of the Secretary.").

As for the inconsistencies the ALJ described, Plaintiff fails to discuss or attack any, leaving the argument undeveloped. *Cf. McPherson v. Kelsey*, 125 F.3d 989, 995-996 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." (citation omitted)). Assuming, however, that the argument has enough meat to avoid forfeiture, it still fails.

For one thing, Plaintiff's explanation for the inconsistencies is simply the passage of time and an allegedly deteriorating condition. (R. 10, PageID.860-62.) The first is irrelevant, on its own: the fact that the first statement long preceded the second does not, without more, render them inconsistent. The second, Plaintiff does not try to prove by, for example, discussing evidence of deterioration. The 2015 CT scan he mentions did display mild spinal canal narrowing and moderate degenerative changes in the sacroiliac joints, (R. 7, PageID.814-15), but these findings constitute raw medical data; without more, such as expert guidance, the CT scan fails to suggest any degree of functional limitation, much less that Plaintiff's functioning had deteriorated. *Cf. Charbonneau v. Comm'r of Soc. Sec.*, No.

33

2:18-CV-10112, 2019 WL 960192, at *15-17 (E.D. Mich. Jan. 11, 2019) (noting caselaw explaining that ALJs, as laypersons, are unequipped to translate raw medical data into functional limitations), *Rep. & Rec. adopted by* 2019 WL 952736 (E.D. Mich. Feb. 27, 2019). And, as the ALJ noted, Plaintiff did not update his Function Report after the Appeals Council remanded his case, thereby forgoing a chance to demonstrate deterioration. (R. 7, PageID.57.)

In searching the ALJ's decision for the source of Plaintiff's argument, I have discovered no errors along the lines Plaintiff suggests. In fact, the ALJ's analysis of Plaintiff's symptoms considered and rejected the alleged deterioration of his condition. (*Id.*) The ALJ observed that Plaintiff worked in 2016 as a caregiver for his aunt (and also noted elsewhere that Plaintiff's "work throughout 2015 [was] at near SGA [*i.e.*, substantial gainful activity] levels"). (*Id.*) He stopped that job because, he said, he began needing the same services he had been providing. (*Id.*, PageID.886-87.) Plaintiff's continued employment through most of the record is a reason for doubting the alleged severity of his symptoms. *See* 20 C.F.R. §§ 404.1571, 416.971 ("The work, without regard to legality, that you have done during any period in which you believe you are disabled may show that you are able to work at the substantial gainful activity level. . . . Even if the work you have done was not substantial gainful activity, it may show that you are able to do more work than you actually did."); *Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1029 (6th Cir. 1990) ("Furthermore, any work done during a period of claimed disability may show that a claimant can engage in substantial activity.").

More particularly here, the fact that Plaintiff worked until 2016 "would place the purported 'worsening' of his impairments . . . sometime in 2016." (R. 7, PageID.57.) Yet, as the ALJ correctly noted, the medical evidence did not support a drastic worsening at that time. Plaintiff does not now flag evidence that suggests otherwise, nor have I found any. The worst of the reports from this period are that his back was tender, had some spasming, and displayed "somewhat limited" range of motion, and his gait was unsteady and hunchback; but as noted, even during many of these sessions his legs had no motor or other deficits and straight-leg raise tests were negative. *See, e.g.*, (*Id.*, PageID.728, 730, 732, 737-39, 797.) None of this suggests a rapid deterioration occurred around 2016 that rendered him unable to work. Further, Plaintiff later failed to state when asked that he had difficulty walking and Dr. Osman discovered he had normal (if somewhat slow) gait, along with normal range of motion and strength. (*Id.*, PageID.824, 830.) Therefore, the ALJ properly handled the complaints of deterioration.

Given the lack of evidence indicating a worsening condition, the ALJ's reliance on the inconsistencies was valid. For example, he noted that at the hearing Plaintiff "alleged he used a cane continuously throughout the day; however, in his Function Report he alleged getting a cane from a friend, but only used it in the mornings 'when waking up.'" (*Id.*, PageID.57.) The ALJ also pointed out that Plaintiff testified he could not "wash laundry, vacuum, sweep, or do outside chores; however, in his Function Report, he could wash laundry, iron, and take out the trash." (*Id.*) [8]

---

[8] That is not to say, however, that the ALJ's analysis is uniformly stellar. It is not. For instance, it finds the following inconsistency: Plaintiff "alleged a prescription for Norco since September 2014; however, at the

The ALJ relied on other rationales that Plaintiff does not challenge. For instance, the ALJ pointed out that Plaintiff's efforts to obtain mental health treatment were lackluster. (*Id.*) This was not because he lacked insurance, but because he could not find a doctor who took his insurance, which the ALJ plausibly thought suggested less-than-full motivation. (*Id.*) In a similar vein, the ALJ relied on Plaintiff's cessation of treatments that were available to him. (*Id.*, PageID.58.) Indeed, Plaintiff stopped attending the Northeast Guidance Center after one session, even though the Center's records indicate he "has medical insurance." (*Id.*, PageID.696.) There is no evidence that Plaintiff's inconsistency in seeking treatment resulted from his mental condition itself, and therefore it provides valid evidence suggesting his symptoms are not as severe as claimed. *See Strong v. Soc. Sec. Admin.*, 88 F. App'x 841, 846 (6th Cir. 2004) (noting that a failure to seek treatment might be due to a mental impairment, but that where no evidence suggested this was the case, the lack of treatment cast doubt on the plaintiff's claims). The ALJ also properly observed Dr. Yunus's frequent reports that Plaintiff's low back pain, leg pain, and anxiety were "Not Indicated," which was another sign that Plaintiff's complaints exceeded the

---

hearing he stated he takes 2.5-3 pills a day, . . . while in his Medication Report, he stated he only took 1-1.5 pills a day." (*Id.*, PageID.57.) Is this an inconsistency? Yes. Is it highly probative? I cannot see how. The issue of the number of pills Plaintiff took and the number he can remember taking is pretty far afield from whether his symptoms plausibly cause disabling functional limitations. Another inconsistency the ALJ discussed dealt with Cymbalta. He thought Plaintiff stated both that he presently took Cymbalta and that he had not taken it since the alleged onset date. (*Id.*) In his 2013 function report and again at the 2018 hearing, Plaintiff stated he took the medication. (*Id.*, PageID.82, 447.) But in a medication report (which is undated but must have come from after October 2017, as it states he was prescribed medication on that date) he did not list Cymbalta. (*Id.*, PageID.484.) The ALJ has hit upon an inconsistency—although he was incorrect that Plaintiff denied taking it since the onset date—but one of dubious value. Nonetheless, Plaintiff raises no arguments against these points and they are not reversible errors in any event given the analysis above.

objective evidence. (R. 7, PageID.59-60; *see also id.*, PageID.724, 726-27, 781-82, 784-85, 787-88, 790, 793, 795, 797, 799, 801; *but see id.*, PageID.724, 790, 795 (finding unspecified low back pain).)

For these reasons, I find no merit in Plaintiff's argument.

### 3. SSR 96-8p

Plaintiff contends that the ALJ violated SSR 96-8p in two ways: she failed to include a reasoned narrative justifying parts of her RFC and she failed to include a function-by-function analysis. (R. 10, PageID.862-64, 867-69.) I address each in turn.

### a. Narrative Requirement

First, Plaintiff argues that the ALJ failed to provide a sufficient narrative discussion of the facts supporting various findings. (*Id.*, PageID.862-64.) Under SSR 96-8p, the "RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." 1996 WL 374184, at *7 (July 2, 1996). The decision must also "describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record." *Id.* When symptoms are at issue, the "RFC must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." *Id.*

According to Plaintiff, the ALJ offered insufficient analysis on three impairments or limitations. The first included his respiratory impairments, COPD and asthma. "Here," Plaintiff states, "the ALJ merely concluded on Page 14 that 'the claimant has respiratory

37

impairments of COPD/asthma, so he is limited to occasional exposure to dust, odors, fumes, and pulmonary irritants.'" (R. 10, PageID.863 (quoting R. 7, PageID.61).) He continues,

> Nowhere in the ALJ's decision does she specifically outline the medical records that brought her to this conclusion. "Occasional" contact is often mean to be up to one-third of the day, which would be incredibly problematic for an individual with COPD and asthma, who has difficulties on a daily basis with breathing. To allow a Plaintiff be exposed up to one-third of each working day to dust, odors, fumes, and pulmonary irritants without in-depth explanation is an error. There is nothing in the medical records to suggest that this would be an acceptable level of exposure for Plaintiff. Therefore, looking exclusively at the COPD and asthma, the ALJ simply makes conclusions that are inconsistent with the medical evidence and not supported by the medical evidence.

(*Id.*)

The ALJ's discussion of COPD and asthma was slim, but not as slim as Plaintiff suggests. She noted, for example, that he had both conditions but took medication only for asthma. (R. 7, PageID.55; *see* R. 14, PageID.888-89 (Plaintiff's testimony).) The ALJ also noted Dr. Yunus's report that Plaintiff denied shortness of breath in August 2016. (R. 7, PageID.58 (citing *id.*, PageID.794).) In addition, the ALJ gave great weight to Dr. Mian's evaluation, although she did not explicitly discuss his conclusion that Plaintiff had no environmental limitations (which are the type at issue here, such as exposure to fumes, *see* 20 C.F.R. Part 404, Subpt. P, App. 2 § 200.00(e)). (R. 7, PageID.61, 131.)

The ALJ could have cited other records from Dr. Yunus in which Plaintiff also denied shortness of breath or reported he had been breathing "fairly well" with only occasional shortness of breath. (*Id.*, PageID.723, 750, 789.) Similarly, Dr. Yunus's reports in March and April 2016 indicated that Plaintiff's asthma caused only infrequent

38

symptoms, and using an inhaler a few times a month relieved them completely. (*Id.*, PageID.728, 730.) These reports led Dr. Yunus to conclude that Plaintiff's "activity is not restricted due to the asthma." (*Id.*, PageID.728.) In more recent records, Plaintiff did not report having COPD or asthma despite the fact that the intake form he was filling out included these as diagnoses he could select. (*Id.*, PageID.829.) The same form also records that he denied shortness of breath. (*Id.*, PageID.830.)

While it may have been better to include these additional pieces of evidence in the decision, the ALJ was not obligated to cite every relevant record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x. 496, 507-08 (6th Cir. 2006) ("[I]t is well settled that[ ] 'an ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.'" (citation omitted)). And, regardless, Plaintiff does not present any evidence favoring greater environmental restrictions.

Indeed, Plaintiff tries to flip the burden of proving his RFC—which he bore, *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003)—onto the ALJ, noting that "[t]here is nothing in the medical records to suggest that this [*i.e.*, the RFC] would be an acceptable level of exposure for Plaintiff." (R. 10, PageID.863.) But the relevant question is whether Plaintiff presented any evidence establishing greater environmental limitations. He fails to point to any now, relying instead on his own medical assessment that the RFC's allowance for "occasional" exposure to particles and irritants is "incredibly problematic for an individual with COPD and asthma." (*Id.*) Yet he has failed to offer evidence that he has more substantial breathing issues or that his condition precludes occasional exposure to the particles and irritants. The evidence above suggests otherwise, as Dr. Yunus thought

the asthma imposed no restrictions and Dr. Mian found no cause for any environmental limitations. If anything, then, the RFC is more generous to Plaintiff than the evidence would warrant. Thus, despite the ALJ's failure to cite some of the evidence, she offered enough (in conjunction with the lack of evidence supporting Plaintiff) to justify her decision.

The second limitation or impairment that the ALJ failed to analyze properly, according to Plaintiff, concerned his concentration. The entirety of the argument spans two lines in his brief: "In addition, the ALJ concludes that affective disorder would cause a lack of concentration. There is nothing in the medical evidence to support this limitation." (R. 10, PageID.863.) The brevity of this contention makes it difficult to comprehend. It reads as though Plaintiff is saying no limitation on concentration is warranted. But it would make little sense if he was arguing that this limitation should be removed altogether and not replaced by a more significant restriction on concentration.

Yet he offers no argument on this point, no evidence regarding his ability to concentrate, and no indication of what type of restriction he thinks he deserves. That is enough to forfeit the argument. *See McPherson*, 125 F.3d at 995-996. Even if not forfeited, it would fail. The ALJ gave great weight to Dr. Morrow's opinion that Plaintiff had a moderate impairment in the ability to concentrate, persist, or maintain pace. (R. 7, PageID.61, 129.) Plaintiff offers no reason to reject this analysis. Further, in his Function Report and his intake form for Dr. Osman, Plaintiff did not check the boxes indicating he had concentration problems. (*Id.*, PageID.445, 830.) Consequently, I see no error in the ALJ's analysis of concentration.

40

The third impairment or limitation that Plaintiff addresses is the RFC's sit/stand option allowing him to change positions every 30 to 45 minutes. (R. 10, PageID.864.) Plaintiff notes that he testified he needed to move every 10 to 20 minutes, so the ALJ's conclusion was inconsistent with that testimony. (*Id.*; R. 14, PageID.907.) Once again, Plaintiff fails to offer objective evidence that a more severe restriction is needed. Instead, the basis for his claim is that the ALJ's conclusion clashes with his testimony. But for the reasons above, the ALJ's assessment of Plaintiff's subjective complaints was appropriate. Therefore, the mere difference between the ALJ's conclusion and Plaintiff's testimony does not provide a reason to reject the RFC or the rationale the ALJ provided. Moreover, Plaintiff's 2015 testimony that he could sit without elevating his leg for 40 minutes is consistent with the sit/stand option the ALJ crafted. (*Id.*, PageID.114-15.)

The ALJ's decision offers justifications for this limitation, many of which were discussed above. For example, it relies on Plaintiff's ability to work as a caregiver into 2016 and the generally normal physical examination results revealing no weakness and often finding no leg pain. (R. 7, PageID.58-60.) Dr. Mian's opinion, which the ALJ utilized, did not indicate any need for a sit/stand option, instead stating that Plaintiff could stand or walk for up to six hours and sit for the same amount in a normal workday. (*Id.*, PageID.60, 131.) The ALJ also could have noted Dr. Shaw's 2013 opinion that Plaintiff had "no significant functional impairment," did not need a cane, and would have no difficulty sitting, standing, and walking during a normal workday. (*Id.*, PageID.571.)

Finally, Plaintiff ends by suggesting that the ALJ reached conclusions regarding the sit/stand option and his breathing issues without the benefit of an expert opinion, and

therefore the ALJ was simply playing doctor. (R. 10, PageID.864.) Caselaw exists in this Circuit regarding the need for expert opinion in formulating an RFC, but Plaintiff does not cite any of it.[9] *See, e.g.*, *Gross v. Comm'r of Soc. Sec.*, 247 F. Supp. 3d 824, 828-29 (E.D. Mich. 2017) (collecting cases). Nor does he explain why expert guidance was needed in this case. Thus, yet again, he has failed to adequately develop an argument. *See McPherson*, 125 F.3d at 995-996. Even if properly raised, it would fail for the following reasons.

As explained above, the medical sources rejected Plaintiff's preferred limitations. Dr. Yunus opined that Plaintiff had no restrictions due to asthma and Dr. Mian found no need for environmental limitations. Regarding the sit/stand option, Dr. Mian's opinion suggested it was unnecessary. The ALJ discussed these sources, even if she did not provide in depth examinations of the relevant parts of the medical opinions. At base, the medical opinions eschewed the limitations Plaintiff claims, and did not even go as far as the ALJ's RFC—which included environmental restrictions and the sit/stand option—in accommodating Plaintiff's subjective complains.

That is enough here to uphold the ALJ's decision, as "[n]o bright-line rule exists in our circuit directing that medical opinions must be the building blocks of the residual functional capacity finding, but the administrative law judge must make a connection between the evidence relied on and the conclusion reached." *Tucker v. Comm'r of Soc. Sec.*, __F. App'x__, 2019 WL 2418995, at *5 (6th Cir. 2019); *see also Gant-Holmes v. Comm'r of Soc. Sec.*, No. 18-cv-12264, 2019 WL 3282741, at *2-3 (E.D. Mich. July 22,

---

[9] In the case he does cite, *Rohan v. Chater*, the issue was not the lack of an expert opinion but the ALJ's disregard of such opinions in favor of his own lay intuition. 98 F.3d 966, 970-71 (7th Cir. 1996).

2019) (same). Here, for the reasons stated, the ALJ made the relevant connection between the evidence and her conclusion. More importantly, there were expert opinions that provided "some medical opinion evidence from which the ALJ may extrapolate to form her own RFC without interpreting raw medical data." *McCaig on behalf of McCaig v. Comm'r of Soc. Sec.*, No. 16-11419, 2017 WL 4211047, at *8 (E.D. Mich. Aug. 25, 2017) *Rep. & Rec. adopted by* 2017 WL 4176734 (E.D. Mich. Sept. 21, 2017). Thus, the ALJ's analysis was sufficient.

### b.      Function-by-Function Analysis

Plaintiff's second argument under SSR 96-8p is that the ALJ failed to provide a function-by-function analysis of his exertional abilities. (R. 10, PageID.867-69.) The Ruling characterizes the "RFC assessment [as] a function-by-function assessment based on all of the relevant evidence of an individual's ability to do work-related activities." 1996 WL 374184, at *2. The RFC consists of exertional and nonexertional capacities. *Id.* at *5. In the former, there are seven functions "that must be considered separately." *Id.* These include standing, sitting, walking, carrying, lifting, pulling, and pushing. *Id.* "Nonexertional capacity considers all work-related limitations and restrictions that do not depend on an individual's physical strength . . . ." *Id.*

Here, after discussing SSR 96-8p and out-of-circuit caselaw, Plaintiff offers the following argument:

> As indicated above, ALJ Tobin disregarded evidence concerning Plaintiff's RFC and instead made conclusory statements in violation of SSR 96-8p. The ALJ failed to provide a function-by-function assessment but instead provides great weight to the opinion of the consultative examiner performed on September 18, 2013 [R. 7, PageID.130-31] that Plaintiff could perform light

43

> work. However, nowhere in the ALJ's decision does she specifically outline Plaintiff's capacity to sit, stand, walk, lift, carry, push and pull and the medical documentation she relied upon in coming to these conclusions. Therefore, this matter needs to be remanded for a proper evaluation of Plaintiff's physical RFC including a function-by-function assessment concerning Plaintiff's ability to sit, stand, walk, lift, carry, push, and pull.

(R. 10, PageID.868-69.) The nub of the argument is that the ALJ needed to "specifically outline" the functions and provide supporting evidence for her conclusions. *Id.*

He gleans this rule from *Hogan v. Astrue*, 491 F. Supp. 2d 347, 354 (W.D. N.Y. 2007). There, the ALJ's decision was rife with errors, including the failure to "specifically determine plaintiff's ability to sit, stand, walk, lift and carry." *Id.* The court concluded that this was error, although it didn't explain why; instead it went on to note that the evidentiary basis for the ALJ's conclusions was unclear. *Id.* Given that the discussion came in a single paragraph, it is not apparent that *Hogan* can stand for the proposition that the ALJ must make the function-by-function analysis explicit.

Regardless of *Hogan*, this Circuit's law is clear. In *Delgado v. Commissioner of Social Security*, the Sixth Circuit explained that "[a]lthough SSR 96–8p requires a 'function-by-function evaluation' to determine a claimant's RFC, case law does not require the ALJ to discuss those capacities for which no limitation is alleged." 30 F. App'x 542, 547 (6th Cir. 2002). More important for the present case, *Delgado* approvingly utilized a Third Circuit opinion stating that "SSR 96-8p does not require ALJs to produce such a detailed statement in writing." *Id.* (quoting *Bencivengo v. Comm'r of Soc. Sec.*, 251 F.3d 153 (table), No. 00–1995 (3d Cir. Dec. 19, 2000)). "[W]hat an ALJ must consider and what an ALJ must discuss in a written opinion" were two different things. *Id.* at 547-48. As long

as the ALJ explained how the evidence supported the RFC, addressed the claimant's capacity for work-related activities, and resolved inconsistencies in the record, the decision would stand. *Id.* at 548 (citing *Bencivengo*, slip op. at *5).

Other courts have likewise observed that SSR 96-8p does not require ALJs to articulate their analysis of the RFC function-by-function; rather, "a narrative discussion of a claimant's symptoms and medical source opinions is sufficient." *Knox v. Astrue*, 327 F. App'x 652, 657 (7th Cir. 2007); *see also Sanders v. Comm'r of Soc. Sec.*, No. 16-cv-13952, 2018 WL 2181096, at *5 (E.D. Mich. Jan. 23, 2018) ("[C]ontrary to Plaintiff's argument, while SSR 96-8p implicitly requires an ALJ to consider all work-related limitations and functions in determining a claimant's non-exertional capacity, it does not require an ALJ to explicitly address Plaintiff's limitations with regard to every work-related function— especially if Plaintiff is not limited with regard to a particular function."), *Rep. & Rec. adopted by* 2018 WL 1531595 (E.D. Mich. Mar. 29, 2018); *Lewis v. Astrue*, 518 F. Supp. 2d 1031, 1043 (N.D. Ill. 2007) ("SSR 96–8p does not mandate a function-by-function articulation requirement. The plain language of SSR 96–8p requires the adjudicator to 'consider, not articulate,' Claimant's RFC in a function-by-function basis."). Thus, the mere failure to expressly address a function will not, without more, constitute error.

Here, Plaintiff simply notes the lack of an explicit function-by-function analysis; he does not offer evidence or argument on what more was needed. That is not enough to demonstrate error. Nor can I discern any violation of SSR 96-8p's function-by-function requirement under the proper framework. The ALJ touched upon the relevant functions by endorsing Dr. Mian's opinion that Plaintiff could perform light work, which covers the

relevant functions. (R. 7, PageID.61.) More specifically, the ALJ addressed lifting by noting that Plaintiff "failed to provide any opinion other than his personal testimony that he could not lift at a light exertion level." (*Id.*) Along the same lines, the ALJ noted evidence that Plaintiff was not experiencing weakness, (*id.*, PageID.58 (citing *id.*, PageID.818)), and she could have cited additional evidence of the same, *see* (*id.*, PageID.728, 730, 732, 737, 739, 742, 743, 745.) The ALJ also explicitly addressed sitting, standing, and walking by tailoring a sit/stand option and permitting cane use while walking. (*Id.*, PageID.61-62.) Plaintiff's subjective complaints were thoroughly canvassed in the ALJ's decision, including statements that related to standing, walking, sitting, and lifting. (*Id.*, PageID.55-57.)

Additionally, Plaintiff's argument does not reveal what limitations he believes he has in any of the seven functions, or even what evidence supports finding greater restrictions in general. Particularly for pushing and pulling, his brief is silent on which impairments affect these functions and how. Indeed, his Function Report and his testimony at the 2018 hearing premised his claim for benefits on his legs, not his arms. (*Id.*, PageID.440, 888.)

In sum, the ALJ examined the objective and subjective evidence, demonstrating she considered the relevant functions. It is not a perfect decision, and could have done a better job of linking the evidence to the conclusions, but I conclude it did enough to pass muster under SSR 96-8p.

### 4.       Cane Use at the Light-Work Exertional Level

Plaintiff argues "[t]he ALJ erred in holding that Plaintiff can perform work at a light exertional level where there is unrebutted evidence that Plaintiff uses a cane for ambulation." (R. 10, PageID.864.) The gist of the argument is that cane use undercuts the RFC's light-exertional level. (*Id.*, PageID.865 ("An individual who uses a cane for ambulation cannot perform the standing, walking, and lifting entailed in the performance of light work.").) To understand the argument, a bit of background is helpful.

"Light work" is an exertional standard defined in the regulations and the Dictionary of Occupational Titles (DOT). In the regulations, the standard requires the ability to "lift[] no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. §§ 404.1567(b), 416.967(b). In addition, it demands "a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." *Id. See also* DOT, App. C, § IV, 1991 WL 688702 (1991) (defining "light work" as having the same lifting requirements as the regulations and also noting that even if the amount to be lifted is negligible, work is "light" "(1) when it requires walking or standing to a significant degree; or (2) when it requires sitting most of the time but entails pushing and/or pulling of arm or leg controls; and/or (3) when the job requires working at a production rate pace entailing the constant pushing and/or pulling of materials even though the weight of those materials is negligible"). "Sedentary work" is another classification, which

> involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of

47

> walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. §§ 404.1567(a), 416.967(b); *see also* DOT, App. C, § IV, 1991 WL 688702 (providing a nearly identical definition).

Plaintiff bases her argument on one regulation and two Rulings that emphasize the differences between the exertional categories. (R. 10, PageID.865-66.) The regulation, 20 C.F.R. Part 404, Subpt. P, App. 1 § 1.00(J)(4), states that the "requirement to use a hand-held assistive device may also impact on the individual's functional capacity by virtue of the fact that one or both upper extremities are not available for such activities as lifting, carrying, pushing, and pulling." In the first Ruling, SSR 83-10, the Commissioner noted that the frequent lifting or carrying in "light work" means "being on one's feet up to two-thirds [*i.e.*, frequently] of a workday," and so a full range of "light work" leads to "standing or walking, of and on, for a total of approximately 6 hours of an 8-hour workday." 1983 WL 31251, at *6 (1983). The second Ruling, SSR 96-9p, states that a person who uses a "medically required hand-held assistive device in one hand may still have the ability to perform the minimal lifting and carrying requirements of many sedentary unskilled occupations with the other hand." 1996 WL 374185, at *7 (1996). The Ruling continues, "On the other hand, the occupational base for an individual who must use such a device for balance because of significant involvement of both lower extremities (e.g., because of a neurological impairment) may be significantly eroded." *Id.* The solution in these cases is "to consult a vocational resource." *Id.*

48

After discussing SSR 96-9p's statement that sedentary work might well remain available for cane users, Plaintiff adds a line: "While the use of such a device does not always impact the ability to perform sedentary work in light of the 'minimal lifting and carrying requirements of many sedentary unskilled occupations,' this is not true for light work, which entails frequent lifting of up to 20 pounds." (R. 10, PageID.866 (no citation provided).) This assertion goes uncited, and nothing in SSR 96-9p's discussion of assistive devices supports it.

Plaintiff's application of these materials appears to be the following. First, he cites his testimony that for the past two years he had used a cane to walk and he also cites the report in the consultative examination that indicated Plaintiff had arrived and departed with a cane. (*Id.*, PageID.75, 569-70.) The main substantive argument comes in the following paragraph:

> Contrary to the ALJ's holding, Plaintiff is not able to perform light work within the limitations of his proper residual functional capacity. The ALJ states in her decision that records are inconsistent about how often the Plaintiff actually uses his cane, yet includes it in her RFC saying he must be allowed to utilize it. [R. 7, PageID.63]. The ALJ erred in minimizing the VE's testimony that Plaintiff, if needing a sit/stand option and to use a cane, would not be able to perform work at a sedentary level [R. 7, PageID.93] and further erred in attempting to get around that testimony by writing an RFC for light work, yet quoting the VE's list of sedentary jobs [R. 7, PageID.63]. The record includes numerous occasions of Plaintiff's documented, continued, chronic pain, and his and the VE's testimony contradict the ALJ's findings.

(R. 10, PageID.866-67.)[10]

---

[10] The first sentence could be read as challenging the light-work limitation in the RFC based on its lack of substantial evidence. But because this is the only sentence to hint at such an argument, Plaintiff has failed to properly raise this challenge. *See McPherson*, 125 F.3d at 995-996.

Plaintiff's argument fails to persuade. As an initial matter, Plaintiff is incorrect that the ALJ minimized "the VE's testimony that Plaintiff, if needing a sit/stand option and to use a cane, would not be able to perform work at a sedentary level." (*Id.*) There was no such VE testimony for the ALJ to minimize. Instead, at the questioning of Plaintiff's attorney, the VE indicated that if Plaintiff needed "a cane for the standing portion of the sit/stand option," then he could not perform sedentary work; the VE did not testify that *any* cane use with the sit/stand option would preclude sedentary work. (R. 14, PageID.909.) To the extent Plaintiff means to argue that he required a cane while standing, he has failed to cite any supporting evidence. Although a few records indicate his gait was abnormal, (R. 7, PageID.781, 784, 787, 797), many others revealed it was normal, (*id.*, PageID.570-71, 592, 627, 629, 632-33, 822), even without a cane, (*id.*, PageID.677-78; *cf. id.*, PageID.621 (noting that Plaintiff did not use a cane and had a slight limp)). None suggests that standing was an issue.

Additionally, as the ALJ noted, Plaintiff was inconsistent regarding his dependence on the cane; in his Function Report he stated he needed it in the morning, while later at the hearing—without, as the ALJ further observed, any sufficient intervening evidence of deterioration—he claimed he used it all day. (R. 7, PageID.57, 446, 488; *see also id.*, PageID.681 (Plaintiff's report to an orthopedic clinic that he "use[d] a cane in the morning when he first begins to ambulate").) Additionally, no medical source recommended a cane or suggested Plaintiff had functional limitations that might obviously require one. The only mention of a cane by a medical source that I could find (and Plaintiff fails to cite any) came from Dr. Shaw, who opined that Plaintiff did not need one. (*Id.*, PageID.571.) Thus, there

is no objective evidence stating a cane was necessary at all, let alone to stand. Still, the ALJ credited his testimony that he used a cane. Plaintiff offers no evidence-based argument that the ALJ erred by not going further and finding that a cane was required to help him stand.

Next, as a legal matter, Plaintiff's implication that cane use undercuts all light work is incorrect. "Case law in this district has found that the use of a cane does not preclude light work." *Marko v. Comm'r of Soc. Sec.*, No. 2:16-cv-12204, 2017 WL 3116246, at *5 (E.D. Mich. July 21, 2017) (collecting cases); *see also Gallegos v. Berryhill*, No. H–17–201, 2018 WL 1069585, at *9 (S.D. Tex. Jan. 22, 2018) ("Plaintiff's contention, based on Social Security Ruling 96–9p's discussion of sedentary work, that '[a]gency policy recognizes that the use of a cane is, at best, consistent with sedentary, not light, work' is unfounded." (citation omitted)), *Rep. & Rec. adopted by* 2018 WL 1035717 (S.D. Tex. Feb. 2, 2018). One court embracing this view explained that "the regulation [20 C.F.R. Part 404, Subpt. P, App. 1 § 1.00(J)(4)] and ruling [SSR 96-9p] Harris cites only provide that use of a cane 'may' impact an individual's functioning capacity." *Harris v. Comm'r of Soc. Sec.*, No. 17-cv-11610, 2018 WL 3359102, at *3 (E.D. Mich. July 10, 2018). Put otherwise, the regulation and Rulings simply observe a possibility, not a certainty or even a probability, that a cane requirement would erode the job base for light work. And even if erosion occurs, enough light-work jobs might remain to support an RFC finding that a claimant can perform a full or limited range of light work.

A cane's impact on light work thus depends on the particular facts before the ALJ. That is why SSR 96-9p's solution is to direct the ALJ to contact a vocational resource. 1996 WL 374185, at *7 ("In these situations, too, it may be especially useful to consult a

vocational resource in order to make a judgment regarding the individual's ability to make an adjustment to other work."). The ALJ here did just that.

The wrinkle, however, is that the ALJ purposefully veered, in part, from the VE's conclusion. The VE testified that an individual could not perform the light-work RFC if he or she needed a cane to walk. (R. 14, PageID.907.) However, the VE added that positions at the sedentary level were available, including as final assembler, mounter, and sorter. (*Id.*, PageID.907-08.) In her decision, the ALJ acknowledged the VE's testimony "that use of a cane would limit claimant to sedentary jobs." (R. 7, PageID.63.) Nonetheless, the ALJ concluded that the evidence "supports an objective finding that the claimant is capable [of] light work." (*Id.*) As a result, the ALJ retained the light-work classification in the RFC.

In this Court, the Commissioner says that even if the ALJ erred in assigning Plaintiff to light work despite the cane, the error is harmless. (R. 15, PageID.928.) This is because the positions the ALJ relied on in her decision were at the sedentary level, and the VE testified that those jobs could be performed by someone with Plaintiff's RFC. (R. 7, PageID.63; R. 14, PageID.907-08.)

I agree with Defendant. Even if the ALJ should have calibrated a sedentary-level RFC, that error is erased by the ALJ's reliance on sedentary-level jobs. In general, "If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. §§ 404.1567(b), 416.967(b). There is no suggestion that had the ALJ directly adopted a sedentary-work limitation it would have created other inconsistencies in the RFC or with the record evidence. The ALJ appears to have

anticipated just such an argument and thus described why Plaintiff could work at the sedentary level consistently with his other restrictions. (R. 7, PageID.63.) For example, the ALJ discussed how restrictions on hand and arm movements might impair sedentary work, but concluded that Plaintiff had no such restrictions and that he could therefore perform sedentary work even if he needed a cane "throughout the workday." (*Id.*) Consequently, the ALJ's finding that Plaintiff can perform light work encompassed a finding that he could also do sedentary work. The VE testified that jobs were available at the sedentary level, and the ALJ relied on those jobs at step five. Thus, Plaintiff could do the jobs that were available and that formed the basis for the step five finding. The error in assigning him to light work, therefore, was harmless.

A similar situation occurred in *Harris v. Commissioner of Social Security*. 2018 WL 3359102. There, the court noted that "even if the ALJ erred when he determined that Harris could perform light work, that error was harmless because the ALJ also determined that Harris could at least perform his past sedentary work, and there was substantial evidence to support that determination." *Id.* at *3; *cf. Jozlin v. Comm'r of Soc. Sec.*, No. 12–cv–10999, 2013 WL 951034, at *9 (E.D. Mich. Mar. 12, 2013) ("Thus, even if the ALJ had included Plaintiff's alleged need to ambulate with a cane in her RFC, as Plaintiff indicated, the RFC would have limited her to sedentary work, and the VE testified that jobs existed in the economy for an individual with such limitations."). Here, it was not Plaintiff's past work that was sedentary but other work; this distinction, however, makes no difference. As such, Plaintiff's argument fails to warrant remand or reversal, as the error he alleges is harmless in any event.

### G.    Conclusion

For these reasons, I would conclude that substantial evidence supports the Commissioner's denial of benefits and I recommend **DENYING** Plaintiff's Motion, (R. 10), **GRANTING** the Commissioner's Motion, (R. 15), and **AFFIRMING** the Commissioner's final decision denying benefits.

## III.   <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file

a concise response proportionate to the objections in length and complexity. Fed. R. Civ.

P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue

raised in the objections, in the same order, and labeled as "Response to Objection No. 1,"

"Response to Objection No. 2," etc. If the Court determines that any objections are without

merit, it may rule without awaiting the response.

Date:  August 27, 2019                          S/ PATRICIA T. MORRIS
                                                Patricia T. Morris
                                                United States Magistrate Judge


## CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: August 27, 2019                           By s/Kristen Castaneda
                                                Case Manager